IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>TERESA P. MARTINEZ, and DAISY FLORES,<br><br>Defendants. | 8:22CR25<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on the motions to suppress filed by Defendant Teresa Martinez ("Martinez") and Defendant Daisy Flores ("Flores"). (Filing No. 53; Filing No. 61.) An evidentiary hearing was held regarding the motions on April 7, 2023. A transcript has been filed and the motions are ripe for disposition. For the reasons explained below, the undersigned will recommend that the motions be denied.

### FACTS

On February 6, 2022, at approximately 11:30 a.m., Deputy Sheriff Jacob Wirthele of the Otoe County Sheriff's Office ("Deputy Wirthele") was on patrol traveling east on Highway 2 in Otoe County, Nebraska. (TR. 8; Exs. 1, 2, 3.) Deputy Wirthele has worked as a deputy sheriff for approximately eight years. (TR. 5.) Before becoming a deputy, Deputy Wirthele attended the Nebraska police academy where he learned about narcotics trafficking and narcotics identification. (TR. 5-6.) Deputy Wirthele testified that he has also attended trainings regarding the differences between the normal motoring public and those involved in drug trafficking. (TR. 6.) Deputy Wirthele stated those trainings taught him about indicators or factors to look for when determining

whether someone might be involved in drug trafficking. (TR. 6.) Deputy Wirthele also testified that through his work, he has gained further experience about the ways drugs are transported and trafficked in Nebraska. (TR. 8.) Deputy Wirthele stated that, as part of his job duties, he stops cars for traffic infractions and that controlled substances are located during those stops weekly. (TR. 7-8.)

While on patrol on February 6, 2022, Deputy Wirthele observed a Ford Expedition with California plates also traveling east on Highway 2. (TR. 10.) Deputy Wirthele stated that the Missouri Bridge was under construction at that time and, in that area, he observed the Expedition speeding. Deputy Wirthele explained that Highway 2 is a four-lane road in one direction, and due to the construction, traffic had to merge into one lane. (TR. 10.) Deputy Wirthele testified that as his cruiser and the Expedition were approaching the sign advising traffic to merge, he observed the Expedition speeding to get in front of a semi. (TR. 10.) Deputy Wirthele estimated that the Expedition was traveling between fifty-five to sixty miles-per-hour in a forty-five mile-per-hour zone. (TR. 11.) Deputy Wirthele gauged the Expedition's speed based on the speed in which he was traveling. (TR. 12.)

Deputy Wirthele activated his lights to initiate a traffic stop. (TR. 13.) When the Expedition stopped, it had already crossed the Nebraska-Iowa boarder into Iowa. (TR. 13.) The traffic stop occurred on the Iowa side of the Missouri River. (TR. 13.) At the time of the traffic stop, Deputy Wirthele was wearing a body camera and there was also a camera mounted in his cruiser. (TR. 14; Exs. 2, 3.) The cameras recorded the traffic stop and Deputy Wirthele's interactions with Defendants. (Exs. 2, 3.)

After the Expedition stopped, Deputy Wirthele exited his cruiser and approached the Expedition on the passenger side. (TR. 13; Ex. 2.) Martinez was in the driver's seat and Flores, who is Martinez's daughter, was in the passenger's seat. (TR. 16; TR. 26; Ex. 2) Deputy Wirthele explained the reason for the stop and asked for a driver's license, registration, and proof of insurance. (TR. 17; Ex. 2.) Deputy Wirthele was given the registration for the Expedition, which had the names Daisy Flores and Martinez Patino listed. (TR. 17; Ex. 14.) Deputy Wirthele was also given Flores' California driver's license. (TR. 19; Ex. 2.) Deputy Wirthele asked Martinez for her driver's license, but she and Flores indicated Martinez did not have one. (TR. 20-21.)

Deputy Wirthele testified that when he was speaking to Defendants at the Expedition, he noticed there was minimal luggage in the car and that each Defendant possessed two cell phones. (TR. 20; Ex. 1.) Deputy Wirthele testified that having minimal luggage and multiple cell phones are things he considers when determining if someone might be involved in drug trafficking. (TR. 20-21.) Deputy Wirthele acknowledged that having little luggage and several phones does not necessarily mean an individual is involved in drug trafficking, but that individuals involved in drug trafficking often have multiple cell phones. (TR. 20-22.)

Deputy Wirthele testified that Martinez and Flores appeared to be nervous during the traffic stop. (TR. 22.) Deputy Wirthele stated Martinez and Flores immediately provided excuses for speeding. (TR. 22-23; Exs. 1, 2.) Flores told Deputy Wirthele that they were traveling to an art museum in Kansas and that it was her birthday weekend. (TR. 23; Ex. 2.) Deputy Wirthele testified that Flores' remarks sounded rehearsed because Flores told him about the art museum in response to his remarks about bald eagles in the area. (TR. 23; Ex. 2.) Flores told Deputy Wirthele that she was celebrating her birthday, but Deputy Wirthele noted that Flores' driver's license indicated her birthday was not for another month. (TR. 23-24.)

Deputy Wirthele told Defendants he was going to issue a warning ticket, and asked Martinez to come to his cruiser so he could get her information. (Ex. 2.) Martinez agreed and sat in the front passenger seat of the cruiser. (TR. 25; Exs. 2, 3.) Deputy Wirthele testified that he always conducts his stops this way and when someone does not have a license, having the individual come back to the cruiser makes things easier. (TR. 24-25.) In the cruiser, Deputy Wirthele asked Martinez where they were traveling, and Martinez told him Kansas. (TR. 26; Exs. 2, 3.) Deputy Wirthele asked Martinez the city they were traveling to, but Martinez did not provide an answer. (TR. 26; Exs. 2, 3.) Deputy Wirthele provided Martinez with the names of some Kansas cities to refresh her memory, but she could not identify where they were going. (TR. 31; Exs. 2, 3.) Martinez indicated it was Flores' birthday and that she had the directions. (TR. 28; Exs. 2, 3.) Deputy Wirthele testified that Martinez's response to this question heightened his suspicion. (TR. 28.) Deputy Wirthele testified that based on his training and experience, multiple occupants know what city they are going to if they are in the same vehicle. (TR. 88.)

Martinez indicated to Deputy Wirthele that they left Fresno, California on February 1, 2022, but later corrected herself and said they left on February 3rd. (Exs. 2, 3.) Martinez said that

3

they planned to be in Kansas about three days. (TR. 28-29; Exs. 2, 3.) Deputy Wirthele asked Martinez what else they planned to do in Kansas, and Martinez indicated they did not have other plans and they were just going to see what was around. (TR. 28; Exs. 2, 3.) Deputy Wirthele testified that this response also raised his suspicions. (TR. 28.)

Martinez indicated to Deputy Wirthele that they had traveled through Lincoln, Nebraska. (TR. 29; Exs. 2, 3.) Deputy Wirthele testified that this also raised his suspicions because the response indicated they were traveling on a much slower route. (TR. 29-30.) Deputy Wirthele testified he went to Google Maps and entered Fresno and a city on the eastside of Kansas and determined Defendants were off route and should have been traveling on I-70. (TR. 29.) Martinez indicated GPS told them to take that route and that they were going that way to avoid storms. (TR. 30.)

Deputy Wirthele began speaking to dispatch while in the cruiser. (TR. 26; Exs. 2, 3.) He provided Martinez's information to dispatch but dispatch was unable to find a license or a female from California with her name. (TR. 26-27; Ex. 3.) Deputy Wirthele also provided Flores' name to dispatch and discovered her license was suspended and revoked. (TR. 27; Exs. 2, 3.) Deputy Wirthele testified that the lack of a license is a factor he considers when determining whether someone might be involved in criminal activity. (TR. 90.)

Deputy Wirthele testified that as he was speaking to Martinez, she positioned herself in the corner of the cruiser—trying to put distance between him and her. (TR. 31; Exs. 1, 3.) Deputy Wirthele testified that he could see Martinez's chest rising-up and down very quickly. (TR. 31; Exs. 2, 3.) Deputy Wirthele stated he considered her rapid breathing and the way she positioned herself in the cruiser in evaluating whether there was something related to drug activity occurring. (TR. 32.)

Deputy Wirthele returned to the Expedition to speak to Flores. (TR. 32; Ex. 2.) He asked Flores where they were going in Kansas, and she told him a museum. (TR. 32; Ex. 2.) Deputy Wirthele asked Flores what city they were going to, and Flores looked at her phone and then said Kansas City. (Exs. 1, 2.) Flores told Deputy Wirthele that they were going to be there a couple days or a week. (TR. 32; Ex. 2.) Deputy Wirthele testified that he noted the time for their stay in Kansas provided by each Defendant was different. (TR. 34.) Flores said they traveled on I-80

through Lincoln Nebraska. (Ex. 2.) Flores also told Deputy Wirthele they were not on I-70 because they missed an exit. (TR. 34.) Flores could not remember where they were when they missed the exit. (Ex. 1.) Deputy Wirthele testified that for them to have missed an exit for I-70, they would have to have been somewhere in Colorado. (TR. 34.) Deputy Wirthele testified that it appeared to him that Defendants had different justifications for why they were not on I-70. (TR. 35.) Deputy Wirthele testified that based on his training and experience, receiving inconsistent answers from people involved in a traffic stop is consistent with criminal activity and drug trafficking. (TR. 90-91.) Deputy Wirthele also noted that during his conversation with Flores, she would cross her arms and avoid eye contact. (TR. 35.) Deputy Wirthele acknowledged that Flores could have been crossing her arms because it was cold outside. (TR. 80.) Deputy Wirthele testified that nervousness, distancing oneself, and avoiding eye contact can be indicators of criminal activity. (TR. 35-36.)

After speaking with Flores, Deputy Wirthele returned to his cruiser. (TR. 36-37; Exs. 2, 3.) Deputy Wirthele told Martinez that Flores said they were going to Kansas City and then showed Martinez on his computer how their route of travel added a lot more time to their trip and that they were way off route. (Ex. 2.) He began printing a warning ticket for Martinez for speeding. (TR. 37-38.) Deputy Wirthele told Martinez that Flores' license was suspended and revoked. (Ex. 2.) Deputy Wirthele told Martinez that he was going to turn around and go back to Nebraska but that if they got pulled over again, they could be cited or taken to jail in a different state for those infractions. (TR. 38; Exs. 2. 3.)

At approximately 11:58 a.m., Deputy Wirthele told Martinez, "So I am done with the traffic stop. I do have some other questions for you if you're willing to answer them for me." (TR. 39; Exs. 1, 2, 3.) Martinez responded, "ok." (TR. 39; Exs. 2, 3.) Deputy Wirthele asked Martinez whether there was anything illegal in the Expedition and Martinez said no. (Exs. 2, 3.) Deputy Wirthele requested consent to search the Expedition, and Martinez asked "why," and indicated that it was not her vehicle. (TR. 39; Exs. 2, 3.) Deputy Wirthele told Martinez he was going to ask Flores for consent to search the vehicle. (Exs. 2, 3.) Deputy Wirthele pointed out to Martinez that the registration had the name "Patino," and Martinez told him that was her middle name. (Ex. 2.) Deputy Wirthele indicated he was going to go speak to Flores again, and said, "I'll just have you stay put here." (Exs. 2, 3.) Deputy Wirthele testified that he had Martinez stay in the cruiser

5

because they were in a construction zone and he did not want Martinez to stand on the side of the road while he spoke to Flores. (TR. 40.)

Deputy Wirthele exited the cruiser and went back to the Expedition to speak to Flores. (TR. 40; Ex. 2.) Deputy Wirthele asked Flores if there was anything illegal in the vehicle, and Flores said there was not. (TR. 82; Ex. 2.) Deputy Wirthele asked Flores for consent to search the vehicle and Flores denied consent. (TR. 41; Ex. 2.) Deputy Wirthele told Flores she had every right to say no. (Ex. 2.) Deputy Wirthele then stated he was going to call for a dog to sniff the vehicle. (TR. 41; Exs. 1, 2.) Deputy Wirthele testified that at that point, he had not yelled at Defendants, pointed any weapons at them, told them they were under arrest, handcuffed them, or used deceptive police tactics. (TR. 41-42.)

Deputy Wirthele returned to the cruiser and again asked Martinez for consent to search because her name was on the registration. (TR. 84; Exs. 2, 3.) Deputy Wirthele told Martinez he was going to call for a dog to sniff the vehicle. (TR. 43; Exs. 2, 3.) Deputy Wirthele informed Martinez that if the dog did not indicate to the presence of narcotics, they would be "good to go." (Exs. 2, 3.) Martinez asked the Deputy what he would do if he found drugs and the Deputy said the items would be confiscated. (Ex. 2.) Deputy Wirthele also informed Martinez she would not be in trouble for a small amount of marijuana. (Exs. 2, 3.) Deputy Wirthele told Martinez that he had to check for available dogs, and Martinez said, "Don't do that." (TR. 43; Exs. 2, 3.) In response, Deputy Wirthele said, "Why is that, is there something in the car that I should be aware of?" (Exs. 2, 3.) Martinez said, yes and that none of it was hers. (Exs. 2, 3.) Deputy Wirthele asked, "It's not yours?," and Martinez told him that somebody paid them and she knows people who traffic drugs. (Exs. 2, 3.)

Deputy Wirthele testified that Martinez's comments came out of the blue and he did not expect her to be so forthright and to say as much as she did about the drug activity. (TR. 43-44.) Deputy Wirthele told Martinez he was going to read her *Miranda* rights, and Martinez said, "Yeah, I know, I know those." (Exs. 2, 3.) Deputy Wirthele explained why he needed to read her *Miranda* rights, and then he *Mirandized* her. (TR. 43-45; Exs. 2, 3.) Martinez then said there was three or four pounds of marijuana in the vehicle and offered to give Deputy Wirthele the marijuana. (Exs. 2, 3.) Deputy Wirthele called for back-up and told Martinez he was going to search the vehicle. (TR. 43-45; Exs. 2, 3.) Martinez then said she needed to talk to Deputy Wirthele. (Exs. 2,3.)

Deputy Wirthele told Martinez she could talk to him while they waited for the backup officer to arrive. (Exs. 2,3.) After talking to Martinez, Deputy Wirthele told Martinez he was going to search the vehicle and Martinez then said she had more in the vehicle. (Exs. 2,3.) Deputy Wirthele clarified what she meant, and Martinez said she also had ten bundles of methamphetamine. (Exs. 2,3.)

Once back-up arrived, officers searched the Expedition. (TR. 46; Exs. 2, 3.) During the search, Martinez remained in the front passenger seat of the cruiser and Flores was placed in the rear, passenger cage of the cruiser. (TR. 46.) Deputy Wirthele testified Defendants were not in handcuffs at that time. (TR. 46.) Through the search, officers located four pounds of marijuana and ten pounds of methamphetamine. (TR 47-48; Exs. 1, 4, 7.) Deputy Wirthele testified that once the narcotics were found, Defendants were placed under arrest. (TR. 52.) Deputy Wirthele stated Defendants were then placed in handcuffs and transported to the Otoe County Jail. (TR. 52.)

While at the jail, Special Agents Kelly Bennett ("Agent Bennett") and Scott Mollner ("Agent Mollner") with the Department of Homeland Security interviewed Martinez and Flores. (TR. 53; Ex. 16.) Martinez and Flores signed *Miranda* waivers. (Ex. 11.) Deputy Wirthele was present during the interviews. (TR. 53.)

## DISCUSSION

Defendants request that all evidence seized by law enforcement based on the stop of the Expedition on February 6, 2022 be suppressed. Defendants do not argue that the initial traffic stop was unlawful, but rather that the stop was unlawfully prolonged without reasonable suspicion or probable cause.[1] Defendant Martinez also argues her statements should be suppressed because her *Miranda* rights were violated. The undersigned finds that the motions to suppress should be denied.

---

[1] In her brief, Martinez makes references to Deputy Wirthele's jurisdiction to make the traffic stop in Iowa. However, it does not appear to the Court that Martinez is arguing that the traffic stop was unlawful because the actual location of the stop was on the Iowa side of the Nebraska-Iowa boarder. In any event, this argument would fail because the location of the stop does not impact this Fourth Amendment analysis. *See Oglesbey v. Lesan*, 929 F.3d 526, 533-34 (8th Cir. 2019) ("[F]or Fourth Amendment purposes, the relevant question is whether an arrest was reasonable, not whether an arrest violated state law or whether an officer was acting within his geographical jurisdiction").

7

1. **Traffic Stop**

A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation. *United States v Andrews* 454 F.3d 919, 921 (8th Cir. 2006) (citation omitted). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021) (quotation omitted). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Andrews*, 454 F.3d at 921.

However, once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the necessary reasonable suspicion to justify a further detention. *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (quotation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission" during a traffic stop typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. "A reasonable investigation of a traffic stop may include requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose of the trip." *United States v. Nabavi*, No. 4:16CR3039, 2017 WL 1207877, at *5 (D. Neb. Feb. 13, 2017) (quotation omitted). An officer may also verify the information provided by the driver by questioning other occupants of the vehicle. *United States v. Foley*, 206 F.3d 802, 805 (8th Cir. 2000) "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." *Rodriguez,* 575 U.S. at 354-55. However, "[r]equesting consent to search after the purpose of a stop has concluded does not violate the Fourth Amendment." *Nabavi*, 2017 WL 1207877, at *5 .

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably [warrant] suspicion that a crime [is] being committed." *Beck,* 140 F.3d at 1136 (quotation omitted). In assessing whether the requisite degree of suspicion exists, a court must "determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion."

*Id*.  "The totality of the circumstances—the whole picture—must be taken into account." *Id*. "[B]oth innocent and criminal acts can create reasonable suspicion." *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (citation omitted).  Also, a court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Beck*, 140 F.3d at 1136 (quotation omitted).  However, an officer's suspicion must not be based on a mere "hunch," or on circumstances which "describe a very broad category of predominantly innocent travelers." *Id*.

Considering the totality of the circumstances, and in light of Deputy Wirthele's considerable experience with drug trafficking investigations, the evidence supports the conclusion that there was reasonable suspicion to extend the traffic stop to wait for a drug dog. Defendants' travel plans were odd and suspicious.  Martinez initially said they left Fresno, California on February 1st, but later indicated they had left on February 3rd. Defendants also took a longer route than necessary to get to their destination by traveling through Lincoln, Nebraska.  It was also unusual that Martinez did not know the city to which they were traveling, even though Deputy Wirthele provided the names of several cities in Kansas to refresh her memory.  Neither Defendant knew exactly how long they would be in Kansas or what they would do there—other than go to a museum for Flores' birthday, which was not for another month.  These unusual travel plans and explanations provided reasonable suspicion to extend the stop. *See United States v. Gastelum*, 11 F.4th 898, 903 (8th Cir. 2021) ("[O]dd answers and strange travel plans can support a finding of reasonable suspicion"); *United States v. Torres*, No. 8:09CR285, 2010 WL 1740587, at *3 (D. Neb. Apr. 28, 2010) (finding reasonable suspicion where the defendant provided inconsistent and uncertain statements about his destination).

A finding of reasonable suspicion is further supported by Defendants' conflicting answers regarding their travel plans. *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) ("[C]onflicting stories may provide justification to expand the scope of the stop and detain the occupants").  Defendants gave different reasons why they selected the longer route.  Flores indicated they missed an exit but did not know where. Martinez said the GPS misinformed them that the route they were on was the shortest, but also said they were traveling that way to avoid bad weather.  Defendants also provided different answers regarding how long they planned to stay

9

in Kansas. Martinez indicated they would be staying three days, whereas Flores said they planned to stay a few days to a week.

Defendants' nervous behavior, the presence of multiple cell phones in the vehicle, the minimal amount of luggage, and the lack of driver's licenses likewise supports a finding of reasonable suspicion. When Defendants were first pulled over, they both explained why Martinez had been speeding, and Flores provided an unsolicited statement that they were traveling to a museum, which was not responsive to Deputy Wirthele's comment about the bald eagles in the area. Martinez's chest was rising and falling rapidly, and she was positioning her body away from Deputy Wirthele while in the cruiser. Flores was folding her arms and avoiding eye contact with Deputy Wirthele. Additionally, there were four cell phones in the vehicle which, accordingly to Deputy Wirthele's training and experience, is an indicator of criminal activity. *See United States v. Pena-Ponce*, 588 F.3d 579, 583-84 (8th Cir. 2009) (finding reasonable suspicion to extend a traffic stop where passenger was nervous, the driver and passenger gave conflicting statements about travel plans, and there were multiple cell phones in the vehicle); *United States v. Newland*, 246 Fed. App'x. 180, 188-89 (4th Cir. 2007) (finding reasonable suspicion when the defendant's license was fake, the defendant was nervous, and there were multiple cell-phones in the car); *Nabavi*, 2017 WL 1207877, at *6 (finding reasonable suspicion based, in part, on the defendant's labored breathing). Considering the totality of the circumstances, the undersigned finds there was reasonable suspicion to extend the traffic stop. Therefore, Defendants were not unlawfully detained under the Fourth Amendment. Martinez's subsequent admission regarding drug trafficking provided officers probable cause to search the vehicle. *United States v. McCarty*, 612 F.3d 1020, 1026 (8th Cir. 2010) (finding that admission that there was marijuana in the vehicle provided law enforcement probable cause to search for the marijuana).

2. **Consent to Search**

Defendants argue that Deputy Wirthele tried to bypass Flores' denial of consent to search the vehicle by asking Martinez for consent to search a second time. However, there is no evidence that Deputy Wirthele had a sinister motive in seeking consent from Martinez again after speaking to Flores, nor was consent needed at that point for Deputy Wirthele to further investigate suspected criminal activity. Throughout the encounter, there was some confusion about who owned the vehicle because the name Martinez gave Deputy Wirthele in the beginning was not the same name

that was on the registration. However, Martinez stated the second name on the registration was hers. So, it appeared that each Defendants' name was on the registration. Deputy Wirthele was trying to clarify ownership of the vehicle while in the process of attempting to obtain valid consent. When Deputy Wirthele returned to Martinez after having been denied consent by Flores, he already had reasonable suspicion to extend the stop, for the reasons explained above. By that point, Deputy Wirthele had already made the decision to call for a drug dog. Deputy Wirthele told Flores he was going to call for a drug dog before he even asked Martinez for consent a second time. Ultimately, the only reason Deputy Wirthele did not call for a drug dog was because Martinez told him not to. Martinez admitted to trafficking drugs, which provided officers probable cause to search, rendering the need for consent unnecessary.[2]

### 3. Miranda

Martinez contends the questioning in the cruiser violated her *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody or otherwise deprived of freedom of action in any significant way. *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012). In determining whether a suspect is "in custody" at a particular time, courts "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990) (quotation omitted). Indicia of custody include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

---

[2] Had Deputy Wirthele called for the drug dog, it is likely that the drugs would have been discovered through the dog sniff. *See United States v. Hammons*, 152 F.3d 1025, 1030 (8th Cir. 1998) (finding drugs admissible as they would have been inevitably discovered if the officer had called the drug dog—as he had planned to do).

11

*Id*. (quotation omitted). Most routine traffic stops do not trigger the need for *Miranda* warnings, and an individual temporarily detained pursuant to an investigatory traffic stop is not in custody for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

Martinez argues that following the completion of the tasks related to the traffic stop, she was "in custody" for purposes of *Miranda*. The evidence does not support this finding. As explained above, by the time the traffic stop was complete, Deputy Wirthele had reasonable suspicion to extend the stop. But, in any event, the record shows Deputy Wirthele's interaction with Martinez after he had issued her a warning ticket was entirely consensual. Whether an encounter is consensual depends on the facts of the case. *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). A person is seized within the meaning of the Fourth Amendment when, under the totality of the circumstances, "a reasonable person would have believed that he was not free to leave." *Id*. "Circumstances supportive of a finding that a seizure occurred include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (quotation omitted).

The totality of the circumstances show that Martinez was not in custody and, instead, voluntarily spoke to Deputy Wirthele once the traffic warning had been issued. Deputy Wirthele asked Martinez if he could ask her additional questions and Martinez agreed. Martinez did not indicate she did not want to speak to Deputy Wirthele or that she wanted to leave. Deputy Wirthele did not tell Martinez that she had to speak to him, use strong arm tactics, or use deceptive strategies. Martinez was not handcuffed, and Deputy Wirthele was the only officer present. The recording of Deputy Wirthele's interaction with Martinez reflects that the entire conversation in the cruiser was pleasant and friendly. Deputy Wirthele did not raise his voice or indicate to Martinez that she had no choice but to comply with his request to respond to additional questions. When Martinez began to make statements about drug trafficking, Deputy Wirthele cut her off and provided a *Miranda* advisement. Martinez indicated she knew her *Miranda* rights and continued to make statements. There is no evidence that Martinez's statements were coerced or involuntary.

Martinez argues that the consensual nature of the encounter changed once Deputy Wirthele instructed her to "stay put" while he went to speak to Flores. However, the Eighth Circuit Court

of Appeals has concluded that a consensual encounter is not transformed into a seizure simply because an officer instructs an individual to stay in place. *See United States v. McManus,* 70 F.3d 990, 992–93 (8th Cir. 1995) (finding that an officer's direction to come back and have a seat did not transform an encounter into a seizure); *United States v. Angell,* 11 F.3d 806, 809–10 (8th Cir. 1993) (stating that officer's statement to "stay there" or "hold it right there" did not transform consensual encounter into seizure), *abrogated on other grounds as recognized by United States v. McKinney,* 120 F.3d 132, 133 (8th Cir. 1997).  The record shows that neither Martinez nor Flores were in custody or under arrest at this point.  It was only after the drugs were found that Defendants were handcuffed, placed under arrest, and transported to the Otoe County Jail.  Martinez's *Miranda* rights were not violated.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Brian C. Buescher that the motions to suppress (Filing No. 53; Filing No. 61) be denied.

Dated this 19th day of May, 2023.

BY THE COURT:


s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.